IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DE'ANGELO ARNEZ JONES,          :
    Plaintiff,               :
                             :
                             :
vs.                            :       CIVIL ACTION 15-00268-KD-B
                             :
WALTER MYERS, *et al.*,          :
    Defendants.              :
                             :

## REPORT AND RECOMMENDATION

Plaintiff De' Angelo Arnez Jones, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(a)(2)(R), and is now before the undersigned on Defendants' Motion For Summary Judgment. After careful review of the pleadings, and for the reasons set out below, it is recommended that Defendants' motion be **granted** in part and **denied** in part, as set out in this report.

## I.  Summary of Allegations.

Plaintiff De'Angelo Arnez Jones brings this action against Walter Myers, William DeSpain, Gary Scarbrough, John Wiley, and Michael Everette for acts of negligence and deliberate indifference in violation of the Eighth Amendment. (Doc. 1).

From its review of the record, the Court summarizes the material factual allegations in this case in the light most favorable to Jones[1]. On June 29, 2014, while housed in Dorm C, at Holman Correctional Facility, Plaintiff Jones claims that inmate Shakil Gamble attacked him with a knife, causing injuries to his back, arms, and chest. (Doc. 1 at 4). According to Jones, Officer John Wiley was assigned to monitor Dorm C at the time of the attack, but Wiley left his post unattended and was "chatting with another officer outside the dorm when the assault occurred."(*Id.*). Inmates Santonio Hicks and Bobby Shamburger assisted in stopping the attack by temporarily restraining inmate Gamble and allowing Jones the opportunity to seek help from an officer. (*Id.*). Jones alleges that while inmate Gamble was restrained, he ran to the front of the dormitory, shook on the bars and yelled to the cadet officer in the cubicle to let him out of the dorm, but Officer Wiley would not authorize or order the door to be opened. (*Id.*). Jones further alleges that Inmate Gamble broke loose from the

---

[1] For summary judgment purposes, the Court's analysis must begin with a description of the facts in the light most favorable to Jones, who is the non-moving party. *See Skritch v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002). "[T]he 'facts' as accepted at the summary judgment stage of he proceedings, may not be the 'actual' facts of the case." *Priester v. City of Rivera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

inmates' hold and proceeded to chase Jones in circles around the dormitory with the knife, while Officers Gary Scarbrough and Wiley, "stared" and "pointed" at Jones from inside the cubical, and watched as inmate Gamble chased him with a weapon.[2] (*Id.* at 4, 8, 11; Doc. 31-1 at 2).

According to Jones, the officers never intervened to assist him. Instead, inmate Gamble eventually "tired out" and voluntarily stopped chasing him. (Doc. 1 at 4, 8*).* Additionally, Jones claims he did not receive medical attention for his stabbing injuries until the next shift change,[3] approximately three hours later, when the evening shift supervisor, Sergeant Bettis, received a tip, questioned him (and inmate Gamble) about the attack, obtained medical attention for him (and inmate Gamble), and transferred both Jones and Gamble to administrative segregation pending an investigation of the incident.[4] (*Id.* at 8).

---

[2]    Additionally, Jones asserts that the dormitory is an open room, without any double bunked beds; therefore, the guards' views of the inmates are unobstructed and "blood stains and commotion [would be] obvious." (Doc. 34 at 3).

[3]    Jones states that following the attack, inmate Bruce Peterson "helped stopped the bleeding by using 'tissue and office tape'". (Doc. 1 at 4; Doc. 31-1 at 2).

[4]    According to Jones, he was placed in segregation cell K-7 and Inmate Gamble was placed in segregation cell L-24. (Doc. 1 at 8). Jones alleges that Inmate Gamble's cell was

Jones alleges that in the days following the incident, Warden Myers and Classification Specialist DeSpain spoke with him and assured him that "[his] attacker would not go unpunished" and that Jones would be returned to general population once his wounds healed. (*Id.*). The Segregation Board, which included Defendants Myers and DeSpain, released Jones to general population on August 5, 2014, and subsequently released Inmate Gamble to general population (unbeknownst to Jones) on August 12, 2014. (*Id.*).

Jones asserts that on August 12, 2014, within an hour of Inmate Gamble's release to general population, Gamble attacked Jones with a knife in "the Masjid" near the S-4 gate, and caused injuries to Jones' left eye, arms, shoulders, and neck. (*Id.* at 9; Doc. 23-4 at 10). Jones also claims that while stabbing him in the chest, arms, shoulders, and back, Inmate Gamble shouted, "I told you I was coming"; "I bet you Die this time!" and "Shut up, ain't nobody here!" (Doc. 1 at 9; Doc. 31-1 at 4). According to Jones, no officers were posted in the area where the attack occurred, and although the attack was observable from the "Population Shift Office," no officers intervened in the fight. (*Id.* at 8-9). Jones asserts that inmate Antonio

directly in front of his but up one level, so he was able to view Inmate Gamble in his cell. (*Id.*).

Nichols helped to restrain inmate Gamble, and while he was doing so, Jones was able to remove the knife from Gamble's hand. (*Id*. at 9). Jones further contends that he and inmate Nichols "wrestled with Inmate Gamble to hold him down on the floor" until the correctional officers arrived. (*Id*. at 9).

Lieutenant Everette, Lieutenant Watson, and Sergeant Kidd arrived to the scene of the altercation (after unnamed inmates informed the officers of the assault). According to Jones, the responding officers remained approximately four to five feet away from the fighting inmates. (*Id*.). Jones asserts that he approached the officers, with the weapon in hand, to seek medical attention, but instead of walking towards him, the officers backed away and ordered him to "drop the weapon", to which he complied. (*Id*., Doc. 31-1 at 5). Jones promptly received treatment following the incident, including sutures to his left eyelid and orbital scans. (Doc. 23-4 at 8, 10, 14, 20).

Jones alleges that while he was in the healthcare unit, Warden Myers stood alongside the doctor and questioned him about the incident and remarked "how 'dumb' inmate Gamble was for blowing his 'second chance'" and "admonish[ed] [Jones] for 'not telling [Warden Myers] that

Inmate Gamble still had a problem with [Jones.]'"[5] (Doc. 1 at 9).  Jones further asserts that

> Defendant Myers . . . appeared to be disappointed.  He shook his head, and asked the whereabouts inmate Gamble; whom [sic] was in the next room, receiving medical treatment; whereof, it is my opinion, that there may have been some kind of "verbal agreement" between inmate Gamble and Defendant Myers, following the week after I had been released from segregation, that Gamble would 'not attack me again', wherefore, my opinion was drawn after hearing Defendant Myers ask inmate Gamble, in the next room, quote on[sic] quote, "Now why you went right back and bother that boy!?"

(Doc. 31-1 at 5).  Following the attack and medical treatment, both inmates were placed in administrative segregation, both received disciplinary charges, were officially validated as enemies, and inmate Gamble was subsequently transferred to another correctional facility. (*Id.*; Doc. 23-4 at 8, 10, 17, 20; Doc. 23-8 at 4-15; Doc 26; Doc. 30 at 17, 29, 32).

Jones brings this § 1983 action against the defendants asserting claims related to the June 29 and August 12, 2014 attacks and seeks monetary damages from Defendants in their official and individual capacities.  (Doc. 1 at 7).  As to the June incident, Jones brings three specific claims. Jones' first claim is against Defendant Wiley.  Jones

---

[5]    To which Jones states, "Although I had no idea." (Doc. 1 at 9).

alleges that the lack of security in Dorm C caused the attack. (*Id.* at 11). Jones' second claim is against Defendants Wiley and Scarbrough. He alleges that his right under the Eighth Amendment to protection from other prisoners was violated. (*Id.*). Jones' third claim is that Defendants Wiley and Scarbrough were deliberately indifferent to his medical needs pursuant to the Eighth Amendment. (*Id.*).

In relation to the August 12 attack, Jones alleges four claims. Jones' first claim is against Defendants Myers and DeSpain for acting negligently and in violation of the Eighth Amendment by releasing Gamble, a known enemy of Jones, into general population. (*Id.* at 5). Jones' last three claims are against Defendant Everett for negligently or with deliberate indifference[6] failing to provide adequate security outside the S-4 gate which would have prevented the attack, failing to provide a "living

_____

[6] In his complaint, Jones articulates only claims of negligence against Lt. Everette; however, out of an abundance of caution and leniency, the undersigned will review the claims pursuant to possible constitutional violations. *Fernandez v. United States*, 941 F.2d 1488, 1491 (11th Cir.1991) (*Pro se* pleadings must be read liberally to determine "whether jurisdiction to consider[them] can be founded on a legally justifiable base."); *United States v. Jordan*, 915 F.2d 622,624-25 (11th Cir.1990) (Courts have an "obligation to look behind the label of a motion filed by a *pro se* inmate and determine whether the motion is, in effect, cognizable under a different remedial statutory framework.").

agreement" between Jones and Gamble before releasing them into general population together, and failing to protect or properly respond to the assault incident. (*Id.* at 6).

Defendants filed Answers and Special Reports and argue that Jones has failed to establish that Defendants had sufficient knowledge of and appreciated the risk of harm, that Defendants acted unreasonably or that their actions or inactions actually caused harm. Thus, Jones cannot establish deliberate indifference. (Docs. 22, 23, 26, 27, 28). Defendants also argue that they are immune from suit in their official capacities, and they assert state-agent immunity from Plaintiff's negligence claims. (Id.). After providing notice to the parties, the Court converted Defendants' Answers (Doc. 22, 27) and Special Reports (Docs. 23, 28, 26) into a Motion for Summary Judgment (Doc. 33), and provided the parties with an opportunity to submit briefs and materials in support or opposition to the motion. Plaintiff filed a response in opposition to the motion. (Doc. 34).

The Court has thoroughly reviewed the parties' pleadings and other submissions. The Motion for Summary Judgment is ripe for consideration.

## II.  Applicable Law.

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'"(emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support

of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc*., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." *Garczynski*, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id*. In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust*

*Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).[7]

Additionally, the undersigned recognizes that while the Court is required to liberally construe a pro se litigant's pleadings, the Court does not have "license to serve as de facto counsel for a party . . . or to rewrite an otherwise deficient pleading in order to sustain an action." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (citations omitted), *overruled* on other grounds by *Randall v. Scott*, 610 F.3d

---

[7] "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." 11th Cir. R. 36-2.

701 (11th Cir. 2010); *see also Giles v. Wal-Mart Distrib. Ctr.*, 359 F.App'x 91, 93 (11th Cir. 2009) (internal citations and quotations omitted) ("Although pro se pleadings are held to a less strict standard than pleadings filed by lawyers and thus are construed liberally, this liberal construction does not give a court license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action.").

## III. Discussion.

### A. Official Capacity Claims

The Defendants named in this action are all correctional officers employed by the Alabama Department of Corrections. Jones has sued each defendant in his official and individual capacity. "Official-capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent." *Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) (citation omitted); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1309 (11th Cir. 2009) ("A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual.") (citation omitted). As a practical matter, then, Jones' § 1983 claims against Defendants in their official capacities

functionally reduce to § 1983 claims against the State itself.

The Eleventh Amendment protects Defendants in their official capacities from Jones' claims. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984) (With some exceptions, "a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought." (citations omitted)); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) ("[S]tate officials sued in their official capacity are []protected by the [Eleventh A]mendment." (citing *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)). In addition, "a state agency[] and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable..." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)). Thus, Jones may not sue Defendants in their official capacities.

## B. Individual Capacity Claims

Defendants, however, are not absolutely immune from suit in their individual capacities.

Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place. *See Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009). "The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee*[ *v. Ferraro*], 284 F.3d [1188,] 1194 [(11th Cir. 2002) ](citation omitted) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)). Qualified immunity is a defense not only from liability, but also from suit... *See id.*

"Under the well-defined qualified immunity framework, a 'public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting *Lee*, 284 F.3d at 1194). Once the official has done so, the burden shifts to the plaintiff to satisfy the following two-pronged inquiry: (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232, 129 S. Ct. 808...The Supreme Court recently has made it clear that [courts] need not employ a rigid two-step procedure, but rather may exercise [their] discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances

in the particular case at hand." *Id.* at 236, 129
S. Ct. 808.

*Gilmore v. Hodges*, 738 F.3d 266, 272-73 (11th Cir. 2013).
"Under controlling law, the plaintiff[] must carry [his]
burden by looking to the law as interpreted at the time by
the United States Supreme Court, the Eleventh Circuit, or
[the highest court of the state from which the case
arose]." *Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th
Cir. 2012) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199
(11th Cir. 2002).

The record evidence amply supports the determination
that all Defendants were acting within the scope of their
discretionary authority as prison officials at the time of
the incidents at issue, and Jones offers no evidence or
argument to the contrary. Accordingly, the burden now
shifts to Jones to show why Defendants are not entitled to
qualified immunity.

### 1. Deliberate Indifference Claims.

The Eighth Amendment provides that, "[e]xcessive bail
shall not be required, nor excessive fines imposed, nor
cruel and unusual punishments inflicted." US CONST. amend.
VIII.   The Eighth Amendment's proscription against cruel
and unusual punishment prohibits prison officials from
exhibiting deliberate indifference to a substantial risk of

serious harm to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *see also Robinson v. California*, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1972) (Eighth Amendment is applicable to the states through the Fourteenth Amendment). The Supreme Court summarized a state's constitutional responsibilities with regard to inmates stating:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) (citations omitted).

In order to prevail on an Eighth Amendment claim, an inmate must make both an objective and a subjective showing. In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir. 1994), the court delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which

inquires whether the alleged wrongdoing was
objectively harmful enough to establish a
constitutional violation, and a subjective
component, which inquires whether the officials
acted with a sufficiently culpable state of mind.

25 F.3d at 983. To prevail on constitutional claims like

the ones asserted by Jones, he must prove that there was "a

substantial risk of serious harm," that the defendant was

subjectively deliberately indifferent to that risk, and

causation. *Hale*, 50 F.3d at 1582; *see also Farmer*, 511 U.S.

at 832-34.

In defining "deliberate indifference," the Supreme
Court in *Farmer* stated:

With deliberate indifference lying somewhere
between the poles of negligence at one end and
purpose or knowledge at the other, the Courts of
Appeals have routinely equated deliberate
indifference with recklessness. *See e.g., LaMarca
v. Turner*, 995 F.2d 1526, 1535 (CA11 1993).... It
is, indeed, fair to say that acting or failing to
act with deliberate indifference to a substantial
risk of serious harm to a prisoner is the
equivalent of recklessly disregarding that risk.

*Farmer*, 511 U.S. at 836. Thus, the Court concluded that the

"subjective recklessness" standard of criminal law is the

test for "deliberate indifference" under the Eighth

Amendment. *Id.* at 839-40. Under this test, there is no

liability for "an official's failure to alleviate a

significant risk that he should have perceived but did not

. . . ." *Id.* at 838. It is not enough that an inmate proves

that the defendant should have known of the risk, but did

not, as actual knowledge is the key. *See, e.g., Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996).

Thus, the undersigned must determine whether Jones has sufficiently alleged that each defendant seeking summary judgment was deliberately indifferent to his safety.

### a. Claims related to June 29, 2014 attack.

#### i. Claim One

As to Jones' first constitutional claim, that the lack of security in Dorm C caused the attack, Defendant Wiley avers that he did not leave his assigned post without relief. (*Id*. at 11; Doc. 23-2). To prove such a claim, Jones must show that Wiley not only left his post, but that he did so with the knowledge that Jones was at risk of a serious injury. *See Farmer*, 511 U.S. at 828 (Correctional officers may be held liable for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and, with this knowledge, disregards that risk by failing to take reasonable measures to abate it.). "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834.

The Eleventh Circuit has "stress[ed] that a 'prison custodian is not the guarantor of a prisoner's safety.'" *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)). "The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act constitutes deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal quotation marks and citations omitted); *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997) (holding that unless a prison official actually makes the inference that a substantial risk of serious harm exists, he does not act with deliberate indifference even where his actions violate prison regulations or can be described as stupid or lazy). An "official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference. *Farmer*, 511 U.S. at 838.

Taking Jones' allegations as true, there is simply no probative evidence sufficient to establish deliberate indifference of "an objectively substantial serious risk of harm" posed by inmate Gamble to Jones prior to the attack on June 29, 2014. *Cf.*, *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991), *overruled in part on other grounds by*

*Farmer*, 511 U.S. at 828 (A plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety."). Specifically, Jones presents no evidence that even he was aware or fearful of a possible attack at the time it occurred. As such, Jones' claim amounts to negligence at best, which is not actionable under § 1983. Thus, it is recommended that summary judgment be granted in favor of Defendant Wiley on this claim. *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy that negligence."); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) ("Merely negligent failure to protect an inmate from attack does not justify liability under section 1983.).

### ii. Claim Two

As to Jones' second claim, that Defendants Wiley and Scarbrough failed to intervene in the June attack, the undersigned finds Jones has presented evidence of a dispute of material fact; thus, it is recommended that summary judgment be denied as to this claim at this time.

Liability for an officer's failure to intervene only attaches if a defendant was actually in a position to

intervene.[8] *See Terry v. Bailey*, 376 F. App'x 894, 896
(11th Cir. 2010) (*citing Ensley v. Soper*, 142 F.3d 1402,
1407 (11th Cir. 1998)).  Jones bears the burden of
demonstrating that Defendants Wiley and Scarbrough were
"physically able and had a realistic chance to intervene
and act in time to protect the inmate plaintiff."
Defendants Wiley and Scarbrough deny that they saw Jones
"running from another inmate yielding a knife, [saw] any
attack, or kn[e]w that any such incident occurred." (Doc.
23 at 2; Doc. 23-2; Doc. 23-3).  Defendant Scarbrough also
contends that he was working in the Main Hall on June 29,
2014, and never entered the cubical for Dorm C. (*Id.*).

In his complaint, signed under penalty of perjury,
Jones alleges that Defendant Scarbrough entered the cubicle
and "[d]eliberately watched another inmate chase me with a
weapon..and [d]id not [r]espond to my call for help." (Doc.
1 at 11).  Jones also asserts that Defendant Wiley would

---

[8]    In this Circuit, the test to determine if liability
may attach to an officer who fails to intervene in an
inmate-on-inmate fight is whether or not: 1) the inmate's
physical assault created a substantial, objective risk of
injury, (2) of which a defendant is subjectively aware, (3)
the defendant was in a position to intervene, and (4) the
defendant did not respond reasonably to the risk of injury.
*Johnson v. Boyd*, 568 F. App'x 719, 724-25 (11th Cir. 2014).
In this action, Jones' largest hurdle lies within the
factual discrepancy between the parties as to whether or
not the defendants were actually aware of the assault and,
thereby, in a position to intervene.

not authorize the opening of the gate, but instead just stared at him while he was being chased. (*Id.* at 5, 8). Jones also submitted a sworn affidavit wherein he asserts that Defendants Wiley and Scarbrough "[stood] in the window of the staff cubicle…,pointed down at [him, and] they spoke amongst themselves," while Jones yelled and rattled the bars and motioned for help. (Doc. 31-1 at 1). Jones further affirms that the defendants "refused to open the gate to help [him] escape" nor did "they come inside the dormitory to help [him]." (*Id.*).[9]

Therefore, the record before the Court currently contains only Jones' version of the facts and Defendants' denial of the same. The law is clear, at the summary judgment stage, it is not the function of the reviewing court to weigh the evidence and determine the truth of the matter; rather, it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252. Where a fact is disputed, the nonmovant's version of the fact is presumed to be true. *Skop v. City of Atlanta, Ga.*, 485

---

[9] Jones has also submitted the unsworn statements of inmates Santonio Hicks and Bobby Shamburger in support of his assertions. (Doc. 31-2 at 14, 15). The inmates' statements, however, are not valid affidavits as they lack an oath affirming them or a notary seal, and they are not declarations in compliance with 28 U.S.C. § 1746, as they are not made "under penalty of perjury." Consequently, the Court has not considered these statements.

F.3d 1130, 1139-40 (11th Cir. 2007)(citing *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied."); *Kingsland v. City of Miami*, 382 F.3d 1220, 1227 (11th Cir. 2004), *cert. denied, De Armas v. Kingsland*, 543 U.S. 919, 125 S. Ct. 80, 160 L. Ed. 2d 203 ("The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment state, we must accept [Plaintiff's] version of the facts as true.)(citing *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002)). In this case, the parties' versions of the event in question are in direct opposition to one another; the resolve of which turns on an issue of credibility, which may not be determined through a motion for summary judgment. Accordingly, Jones has presented evidence of a factual dispute that may only be determined by a trier of fact, and summary judgment must be denied at this time.

### iii. Claim Three

The undersigned also recommends denial of summary judgment with respect to Jones' third claim related to the June 29, 2014 attack, namely that Defendants Wiley and

Scarbrough were deliberately indifferent to his medical needs.

To establish such a claim, Jones must show "(1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." *McDaniels v. Lee*, 405 F. App'x 456, 458 (11th Cir.2010) (citing *Mann v. TaserInt'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009)). To satisfy the first objective element, Plaintiff must prove his condition was, in fact, a serious medical need. "A 'serious medical need' is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir.2010) (internal quotations omitted).

"To satisfy the subjective element of [a] deliberate indifference [claim, a] . . . Plaintiff must prove three subparts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir.2005) (internal quotations omitted) (noting that subjective knowledge requires that defendant "'must *both* be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, *and* [ ] must also draw the inference'")(quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811, (1994)); *see also Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999).

Jones contends that he was bleeding as a result of the June 29th attack, that another inmate helped him to stop the bleeding by using "tissue" and "office tape", and that he was not sent for medical attention until after a new shift of officers arrived on duty nearly three hours later. (Doc. 1 at 8). The single medical record from June 29, 2014 reflects that Jones had four holes to his back and right upper shoulder, and a hole to his front right upper shoulder. (Doc. 23-4 at 2). According to the record, the medical treatment consisted of cleaning the wounds and bandaging them to lessen the risk for infection. Notably, Jones did not need sutures for the wounds, he had no signs

of distress when examined, there was no observation of weakness due to blood loss, no blood pressure issues, and no follow up care was necessary.(*Id.*). However, the presence of "holes" would appear to denote sufficient wound depth consistent with stabs from a knife. (*Id.*).

As discussed above, based on the record before the Court, there remains a question of material fact as to whether or not Defendants Wiley and Scarbrough had subjective knowledge that Jones had been stabbed with a knife, and was being chased. If Jones is able to establish that Defendants observed that he had been wounded and was bleeding, it would follow that Defendants would be responsible for taking steps to ensure that he received medical care. Thus, without deciding the objective and subjective prongs of this claim, the undersigned determines that summary judgment should be denied as to this claim, and the claim should be carried and analyzed along with Jones' failure to intervene claim.

### b. Claims related to August 12, 2014 attack.

In his complaint, Jones raises claims of deliberate indifference against Defendants Warden Myers and Classification Specialist DeSpain for their release of a known enemy, inmate Gamble, into general population on August 12, 2014. (Doc. 1 at 5). Jones further alleges

multiple claims against Defendant Everette relating to a failure to protect him from the attack.

Defendants have submitted the incident report generated following the August 12, 2014 attack. (Doc. 26). The report details that at approximately 4:55 p.m., the Shift Commander, Lieutenant Everette ("Lt. Everette"), observed commotion outside of the S-4 gate near the Masjid. (*Id.* at 2). According to the report, Lt. Everette saw Jones and inmate Gamble "on the ground in a puddle of blood." (*Id.*). The report differs from Jones' version of the event in that Lt. Everette claims he immediately called a Code Red and grabbed Jones and held him until assistance arrived, while inmate Antonio Nichols grabbed and held inmate Gamble until assistance arrived. (*Id.*). In the incident report and Lt. Everette's affidavit, Lt. Everette asserts that upon notice that Jones was holding a weapon in his right hand, he placed Jones against the wall, ordered him to drop the weapon, and Jones complied. (*Id.*). At least five additional officers responded to the scene of the attack, and assisted in escorting both Jones and inmate Gamble to the healthcare unit where they were treated for injuries. (*Id.*).

According to the incident report, the two inmates were questioned by Warden Myers and Captain Fails in the healthcare unit, and Jones informed Captain Fails that,

> Inmate Gamble approached him over a cellular phone. Inmate Jones alleged that he sold the cellular phone and paid Inmate Gamble $150.00 dollars for the cellular phone. Inmate Jones further stated Inmate Gamble hit him above his eye with the knife and he manage[d] to take the knife from Inmate Gamble and used it on him. Inmate Jones also stated that only he and Inmate Gamble were involved in the fight. Lieutenant Everette questioned Inmate Gamble and Inmate Gamble refused to answer any and all questions.

(*Id.*). With the parties' versions of the facts laid out, the undersigned will analyze the claims associated with the August 12, 2014 attack, in turn.

### i. Defendants Myers and DeSpain.

Defendants Myers and DeSpain deny the allegations asserted against them and state that they had no knowledge of a risk of harm to Jones by inmate Gamble when the decision was made to release inmate Gamble to general population. Specifically, Defendants assert that no record exists of any prior incident involving Jones and inmate Gamble, that Jones never reported the identity of his attacker, or that he had problems with inmate Gamble prior to August 12, 2014. (Doc. 23 at 3).

In support of their defense, Defendants present Jones' body chart from June 29, 2014, where Jones refused to

comment on the cause of his injuries or name his attacker,[10] and Defendants further argue that Jones was processed into administrative segregation on June 29, 2014 pending an investigation for fighting. (Doc. 23 at 3; *see also* Doc. 23-4 at 2; Doc. 30 at 17). Additionally, Defendants contend that Jones signed a memorandum on July 15, 2014, prior to his release from segregation, which provides further evidence that Defendants were unaware that Jones and inmate Gamble were enemies, and indicates that Jones was not in fear of his safety or of inmate Gamble at the time he was released into general population. (Doc. 23-1 at 7). The executed memorandum states,

> I do not feel I would be in danger by returning to (or entering) Holman's population. I feel comfortable with this decision and so save harmless the Department of Corrections and its agents, by allowing me to return to (or enter) population.

(*Id.*). In further support of their decision to release inmate Gamble from segregation into general population, Defendants maintain that Gamble had a "ten month clear disciplinary record" and nothing in his file indicated he was a danger to other inmates, specifically Jones. (Doc. 23 at 3).

_____

[10]    The medical record reveals that when Jones was "asked by the medical staff the cause of [his] injuries, he refused to comment and stated, 'I have nothing to say.'" (Doc. 23 at 3; Doc. 23-4 at 2).

In opposition to Defendants' denial of the allegations against them, Jones submits that Defendants were aware of the risk to his safety because they would have been privy to the "72-hour investigation" notice prepared by Sgt. Bettis following the June 29, 2014 attack. (Docs. 30, 31). According to Jones, the prepared report was a standard AR9 form, a document required by Alabama Department of Corrections Administrative Regulation Policy 433, 435, and 436, and that Defendants, as members of the Segregation Board, would have read this document and had knowledge of the stabbing incident between the two inmates.[11] (Doc. 31-2 at 3).

Jones also disputes Defendants' assertion that he did not discuss the attack with or identify his attacker to the

---

[11] Jones claims he no longer possess his personal copy of the investigation notice, as it was destroyed during a Riot Team "shakedown" at the prison. (Doc. 31-1 at 3; Doc. 31-2 at 3). Additionally, in an unsworn pleading, Plaintiff's Response to Defendants' Special Report, Jones claims that since the filing of this action, he has "asked Sgt. Bettis (who is now Sgt. Jackson) if she remembered the incident, . . . and Sgt. Jackson (Sgt. Bettis) did say she remembered the incident, and did admit to writing an incident report." (Doc. 30 at 4).

While Defendants deny the existence or knowledge of this report and Jones claims he no longer has his copy of this notice, the Court, at this stage of the case, accepts Jones' version of the facts, including the existence of the AR9 investigation notice. (Doc. 31-1 at 3; Doc. 31-2 at 3).

medical staff on June 29, 2014 because: (1) he had just reported the incident to Sgt. Bettis and he and Gamble had been questioned by her, (2) Gamble was receiving treatment in the medical unit at the exact same time as he on June 29, 2014, and (3) the Corizon medical staffers are not the "proper officials to relate the incident to." (Doc. 30 at 4; Doc. 31-2 at 5). Additionally, Jones argues that Defendant Myers knew the identity of his attacker because while Jones was housed in segregation, Defendant Myers viewed Jones' stab wounds several times and remarked that, "he would 'deal with Gamble,' and that [Jones] would be released back to population, after [he] had 'healed up.'" (Doc. 31-1 at 3).

Lastly, Jones acknowledges signing the "hold harmless" letter on July 15, 2014, before being released to general population, but contends that at the time he executed the letter, he could literally see Inmate Gamble in his segregation cell and, therefore, felt safe because he had no reason to think that Gamble would also be released into general population. (*Id*. at 4).

A review of the record would appear to support Jones' assertion that Defendants Myers and DeSpain were likely made aware of the June 2014 altercation between him and inmate Gamble due to the undisputed fact that both inmates

were moved simultaneously to administrative segregation holding cells on June 30, 2014.[12] (Doc. 30 at 17, 29). Accordingly, for purposes of this motion, the undersigned will assume that a standard AR9 investigation notice was prepared regarding the attack and, as argued by Jones, that Defendants Myers and DeSpain had knowledge of such a report. However, knowledge of the inmates' oppositional history alone is not *prima facie* evidence of Defendants' failure to protect Jones from a future attack. The legal standard on this issue is clear, only "[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth

---

[12]    The Inmate Movement History reflects corresponding cell transfers of Jones and inmate Gamble in the days following the June 29, 2014 attack, as referenced below:

6/30/14 12:04   Both inmates are classified as "Bin: Holding";

6/30/14 12:12   Both inmates are moved to Beds: Jones (A1-8A), Gamble (A1-21A);

7/02/14    14:58   Both inmates are moved: Jones (D1-59A), Gamble (A1-85A);

7/02/14    17:28   Jones is moved to Bed: K1-7A / status changed to ADMIN SEG ; "Comments:  Placed in seg pending disciplinary action";

7/04/14    00:35   Gamble is moved to Bed: L1-24A / status changed to ADMIN SEG; "Comments: Inmate Gamble placed into segregation"

(Doc. 30 at 17, 30).

Amendment." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc). Therefore, "[t]o survive summary judgment on a deliberate indifference failure-to-protect claim, 'a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" *Caldwell v. Warden, FCI Talladega*, 748 F.3 1090, 1099 (11th Cir. 2014) (quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013)(internal quotation marks omitted). Jones, however, fails to establish these necessary elements to overcome his summary judgment burden; namely, Jones fails to show that he was ever threatened or fearful of a substantial risk of serious harm, much less that Defendants were subjectively aware of a serious risk of harm to him by Inmate Gamble.

Specifically, the record lacks evidence of the cause for the June 29, 2014 attack; thus, there is no way to determine if a grudge, problem, or threat persisted beyond the incident. Also lacking is objective evidence that either Jones or inmate Gamble received a disciplinary charge related to the June 29, 2014 incident (Doc. 23-1 at 3; Doc. 30 at 29-30; Doc. 1 at 8), thus indicating that there was insufficient evidence to hold either inmate responsible for the attack *or* for the institution to

validate the two inmates as security risks or enemies.[13]

The record further supports the conclusion that Jones himself was not fearful of inmate Gamble following the June 29, 2014 attack, as Jones submits that inmate just "stopped chasing [Jones] on his own." (Doc. 1 at 8). According to Jones, Inmate Gamble just "became tired" and quit viciously attacking him. And, thereafter, the two inmates remained in the same dormitory (Dorm C) together for approximately three and half to four hours without any incident, without threats, and without Jones once claiming fear for his life. (Doc. 1 at 4, 8). Jones further fails to allege that he ever expressed any fear for his safety to Sgt. Bettis following the June incident.

Additionally, Jones claims that he was placed in an adjacent segregation cell to inmate Gamble's and that he could see inmate Gamble from his cell; yet, Jones fails to report a single threat made by inmate Gamble during said period or ever subjectively being afraid of Gamble. (Doc. 1 at 8). Accordingly, the record is entirely void of any specific threat made by inmate Gamble or that Jones ever

---

[13]    In fact, the Inmate Movement sheet details that Jones was officially placed in Administrative Segregation on July 2, 2014 "pending disciplinary action" and inmate Gamble was transferred to Administrative segregation two days later, on July 4, 2014, with no notation of possible disciplinary action. (Doc. 30 at 17, 30).

requested inmate Gamble be validated as an enemy.[14]  *See Johnston v. Crosby*, 135 F. App'x 375, 377 (11th Cir. 2005) (holding that where allegations simply inferred that prison officials should have known that inmate attacker posed a threat to others due to past behavior and general verbal threats, defendants were entitled to summary judgment because plaintiff provided no evidence that prison officials "had subjective knowledge of the risk of serious harm presented by [inmate-attacker]" and "introduced no evidence indicating that he notified [the defendants] of any particularized threat by [his inmate-attacker] nor of any fear [he] felt"); *Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) ("[B]ecause [plaintiff] alleged no facts indicating that any officer was aware of a substantial risk of serious harm to him from [his attacker]

---

[14]    Jones does allege that on August 5, 2014, when he was released to general population, he saw "inmate Gamble standing in the glass window of his cell door, as [he] was being released; wherefore, [Gamble] displayed annoyed anger, and yelled profane threats.  However; I paid them no mind, because I felt certain that he would not be able to carry out anymore attacks." (Doc. 31-1 at 4).  This vague statement does not suffice to establish that the named Defendants had subjective knowledge of a serious risk to Jones' safety.  (In fact, Jones claims by this same statement that he was not fearful for his safety.). *Chatham v. Adcock*, 334 F. App'x 281 (11th Cir. 2009) (Where plaintiff claimed fellow inmate threatened him repeatedly in the days before assaulting him, but failed to identify a specific "serious threat", no subjective knowledge on the part of the defendant officers was found.).

35

and failed to take protective measures, his [failure-to-protect] claim fails."); *McBride v. Rivers*, 170 F. App'x 648, (11th Cir. 2006) (Plaintiff's statement to officer that, "me and that dude had problems. I'm in fear for my life. Don't put me in a cell with him" was insufficient to put defendant on notice of a serious risk of harm.).

Lastly, the undersigned finds that Defendant Myers' alleged statements made in the healthcare unit strongly suggest that that Myers did *not* believe or anticipate an attack on Jones.[15] "The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted); *Rich v. Bruce,* 129 F.3d 336, 339-340 (4th Cir. 1997) (unless a prison official actually makes the inference that a substantial risk of serious harm exists, he does not act with deliberate indifference even though his actions violate prison regulations or can be described as stupid and lazy). Warden Myers' alleged comments demonstrate that

---

[15] Jones contends that in response to the August 12, 2014 attack, Warden Myers remarked that inmate Gamble "blew his second chance," "admonished Jones for "not telling him that Inmate Gamble still had a problem with him," and questioned inmate Gamble as to "why he went right back and bother that boy?!"

he was shocked by the assault and did not anticipate such an attack from inmate Gamble; thus, Myers lacked the subjective knowledge of a serious risk of harm required to establish deliberate indifference.

Consequently, the record is void of any indication that Jones personally feared for his safety or felt threatened and, moreover, belies Jones' claim that Myers and DeSpain were subjectively aware of any risk to Jones' safety when they released him into general population on August 5, 2014 or when they released Inmate Gamble on August 12, 2014. "An official's failure to alleviate a significant risk that he *should have* perceived *but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837-838 (emphasis added). "Proof that the defendant should have perceived the risk, but did not, is insufficient." *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer,* 511 U.S. at 838); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (quoting *Farmer,* 511 U.S. at 838) (same). Accordingly, the undersigned recommends that summary judgment be granted in favor of Defendants Myers and DeSpain on the allegations of deliberate indifference to Jones' safety and failure to protect.

## ii.  Defendant Lieutenant Everette.

As stated previously, Jones alleges Lieutenant Michael Everette ("Lt. Everette"), as the supervisory shift commander, negligently or with deliberate indifference failed to provide adequate security outside S-4 gate on August 12, 2014, which would have prevented the attack, failed to provide a "living agreement" between Jones and Gamble before releasing him into general population together, and failed to immediately respond to the assault incident. (Doc. 1 at 6, 8).

The record before the Court reveals that Jones' claims against Defendant Everette do not rise to the level of a constitutional violation.  First, the record is completely devoid of evidence that Defendant Everette acted with deliberate indifference in failing to post a guard at the S-4 gate.  Although Jones contends that Defendant Everette admitted that the prison was "short staffed" at the time of the complained of incident, Jones fails to dispute Defendant Everette's declaration that the S-4 area is never a security post.[16]  (Doc. 28-1 at 1).  Thus, there can be no

---

[16]  Lt. Everette declares that on the day of the attack, he was responsible for assigning security posts to officers but that "the S-4 gate area in front of the Masjid, where the incident on August 12, 2014, occurred, is not a security post and would not have been manned."  (Doc. 28-1 at 1).

liability for Lt. Everette's failure to assign an officer to the location on the date of the incident.

Second, the record is devoid of evidence that Defendant Everette played any part in releasing Inmate Gamble from segregation to general population on August 12, 2014. *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) ("It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability.") (internal quotation marks and citation omitted).[17] If Defendant

---

[17]     [S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. *Gonzalez*, 325 F.3d at 1235, 2003 WL 1481583, at *5; *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *5 (quoting *Braddy v. Fla. Dept. of Labor & Emp't*, 133 F.3d 797, 802 (11th Cir. 1998)); *Brown*, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's "'custom or policy ... result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing

Everette did bear responsibility in Inmate Gamble's release

to general population, there is still no liability for the

failure to secure a "living agreement" between the inmates.

As previously discussed, the record evidence negates the

claim that Defendants Myers and DeSpain were subjectively

aware of an actual risk of harm to Jones. This is true for

Defendant Everette as well.

Defendant Lt. Everette affirms that at no time prior

to the incident was he aware of any issue(s) between Jones

and Inmate Gamble (Doc. 28 at 2), and Jones has failed to

present any evidence refuting this or showing that

---

so." *Gonzalez*, 325 F.3d at 1235, 2003 WL 1481583, at *5 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Hartley*, 193 F.3d at 1263; *see also Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted).

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). In instances where supervisory liability is based on a supervisor's custom or policy, a plaintiff must show that the custom or policy was "the 'moving force [behind] the constitutional violation.'" *Pinkney v. Davis*, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted). "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." Id. (citations omitted).

Defendant Everette personally knew of an existing risk to Jones' safety, nor does Jones claim that he reported a threat or fear of harm to Defendant Everette, or that he requested that he and Inmate Gamble be validated as enemies.

Last, Jones claims that Defendant Everette is liable for failing to "break up the struggle" upon arriving at the S-4 gate. (Doc. 31-1 at 5). The law "is clear that [i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983," *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998) (quotation marks omitted), but the Eleventh Circuit has declined to expand this sort of claim involving an officer observing an inmate-on-inmate fight. *Johnson v. Boyd*, 568 F. App'x 719, 722 n.2 (11th Cir. 2014). However, this "Circuit has held that a prison official *may* be liable under the Eighth Amendment for failing to take reasonable steps to intervene on behalf of the victim of an ongoing assault by another inmate." *Smith v. Andrews*, 2015 U.S. Dist. LEXIS, *5 (S.D. Ga. 2015)(emphasis added)(citing *Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) (applying deliberate

indifference standard to claim that prison official failed to intervene in inmate-on-inmate assault)).

To establish such a claim, Jones has the burden to demonstrate that: 1) the inmate's physical assault created a substantial, objective risk of injury, (2) of which a defendant is subjectively aware, (3) the defendant was in a position to intervene, and (4) the defendant did not respond reasonably to the risk of injury. *Id.*, *citing Johnson*, 568 F. App'x at 724-25.

> In situations in which an inmate seeks to hold officers liable for failing to intervene in an attack at the hands of another inmate, liability attaches only if the officer "'was physically able and had a realistic chance to intervene and act in time to protect the inmate plaintiff.'" *Smith v. Andrews*, CV 114-206, 2016 U.S. Dist. LEXIS 158786, 2016 WL 6818755, at *4 (S.D. Ga. Nov. 16, 2016) (quoting *Glispy v. Raymond*, 2009 U.S. Dist. LEXIS 77087, 2009 WL 2762636, *3 (S.D. Fla. 2009)), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 170501, 2016 WL 7197446 (S.D. Ga. Dec. 9, 2016). "Regardless of the presence or absence of a weapon in the hands of the attacking inmates, 'no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence.'" *Seals v. Marcus*, No. 1:11-CV-99-WLS, 2013 U.S. Dist. LEXIS 25299, 2013 WL 656873, at *8 (M.D. Ga. Jan. 25, 2013) (*quoting Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006)); *see also Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm."); *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) ("[A]ll of the

authority of which we are aware leads to the
conclusion that such heroic measures
are not constitutionally required.").

*Christian v. Toole*, 2017 U.S. Dist. LEXIS 24793, *8-9, 2017

WL 707491 (S.D. Ga. 2017).

The August inmate-on-inmate assault incident was no

doubt a serious fight with potentially grave consequences

easily observable to the defendant. With no account in the

record as to how long the assault continued, how long it

took before Lt. Everette arrived at the scene, or how long

it took backup assistance to arrive, the undersigned must

makes reasonable inferences in favor of Jones, relying on

Jones' version of the events. Jones describes the facts

relevant to this claim as follows:

> [As soon as inmate Gamble spotted me, he ran
> towards me . . . and began stabbing me . . . . I
> was stabbed multiple times in my chest, back, and
> arms. . . . I continued to fight, because no ADOC
> officials had arrived, although I was conscious
> of the fact that there was a surveillance camera
> just above us.
>
> However, fortunate enough, I was able to get
> the knife out of inmate Gamble' hand, after we
> both had taken a fall, wherein, Defendant
> Everette, and other ADOC officers had finally
> arrived; yet made no attempt to break up the
> struggle. Instead, there were only loud screams
> by Defendant Everette, and other ADOC officers .
> . . for me to "drop the knife!" However, inmate
> Gamble was trying to get the knife back, and
> choking me, in a "pool of blood."
>
> However, inmate Antonio Nichols intervened
> to help me, restrained inmate Gamble, whereas, I

> was able to obey the direct orders given. . . . I
> approached Defendant Everette, with the intention
> of handing him the weapon, he and the officers
> standing around, all began to move away, at the
> same time. I was told to "just drop it"…
>
> Nevertheless, . . . [the officers] escorted
> me to the healthcare unit, where I received
> medical attention.

(Doc. 31-1 at 4-5).

Based on these facts, the undersigned finds no deliberate delay in Lt. Everette's intervention. As the first officer at the scene, it is undisputed that Lt. Everette immediately called a Code Red for assistance. (Doc. 26 at 2; Doc. 31-1 at 5). Lt. Everette's decision to attempt to stop the assault verbally (with commands to "drop the knife") rather than to physically intervene also seems prudent in light of the circumstances. *Mackay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir. 1995) (No deliberate indifference where officers responded to situation by attempting to defuse the situation verbally as opposed to physically intervening immediately.); *See, e.g., Williams v. Simmons*, No. 5:11-CV-00378-MP-GRJ, 2014 U.S. Dist. LEXIS 57159, 2014 WL 1664549, at *10 (N.D. Fla. Apr. 24, 2014) (Officer "acted reasonably and pursuant to policy in maintaining control over the other prisoners and signaling control instead of physically intervening in the attack."); *Averhart v. Kendrick*, No. 2:11-CV-02567-VEH,

2014 U.S. Dist. LEXIS 24448, 2014 WL 771126, at *4 (N.D. Ala. Feb. 25, 2014)(Magistrate judge's findings and recommendation were adopted as to grant qualified immunity to official who failed to intervene in inmate-on inmate assault, reasoning "it is not clearly established that guards have a constitutional duty to immediately intervene in the armed assault of an inmate where intervention would place the guard in danger of physical harm.); *Sanford v. Toby*, No. CV 311-060, 2013 U.S. Dist. LEXIS 127402, 2013 WL 4787143 at *8 (S.D. Ga. Sept. 6, 2013)(finding that an officer's failure to physically intervene in inmates armed cell fight was reasonable and without deliberate indifference where officer reported to the scene, radioed for assistance, and continued to verbally order inmates to separate until a shield could be obtained were adopted.).

Furthermore, Jones fails to present evidence that Lt. Everette "had the ability to *reasonably* insert himself between [Jones and Gamble] to stop the assault without additional help" or while the inmates had control of a knife. *Ledlow v. Givens*, 500 F. App'x 910, 911 (11th Cir. 2012) (emphasis added) (Plaintiff failed to prove that officer had the ability to intervene to stop another inmate from kicking the plaintiff until further assistance arrived.); *Hadley v. Gutierrex*, 526 F.3d 1324, 1330-31

(11th Cir. 2008) (An officer must be in a position to intervene before liability may attach for failing to intervene); *Patmon v. Parker*, 3 F. App'x 337, 338 (6th Cir. 2001)("[P]rison guards have no constitutional duty to intervene in an armed assault by an inmate when the intervention would place the guard in danger of physical harm."). The undersigned finds that Lt. Everette's response to the situation was reasonable and does not indicate deliberate indifference. Thus, summary judgment should be granted in favor of Lt. Everette on Jones' constitutional claims against him.

### C. Negligence Claims.

Defendants have interpreted Jones' complaint as possibly alleging state law negligence claims in addition to the claims of deliberate indifference (despite that Jones never directly articulates or argues any state law claim in his pleadings), and Defendants have asserted immunity from suit on any and all state law claims. The Court acknowledges that, to the extent Jones has asserted state law negligence claims, it has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367. However, the undersigned finds that Defendants Myers, Scarbrough, Everette, and Wiley (on Claim 1) are entitled

to immunity on the state law claims asserted against them. (Doc. 23 at 12-14).

Alabama law provides that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. CONST. art. I, § 14. "The wall of immunity erected by § 14 is nearly impregnable." *Lefree v. Quezada*, 582 F. 3d 1260 (11th Cir. 2009) (citing *Patterson v. Gladwin Corp.*, 835 So. 2d 137, 142 (Ala. 2002). "A suit against a State agency, or against State agents in their official capacities, is a suit against the State. *Burgoon v. Ala. State Dep't of Human Res.*, 835 So. 2d 131, 133 (Ala. 2002)(citing *Ex parte Mobile City Dep't of Human Res.*, 815 So. 2d 527 (Ala. 2001).

"A State agent *shall* be immune from civil liability in his [] personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising his [] judgment in the administration of a department or agency of government, including, but not limited to, . . . hiring, firing, transferring, or supervising personnel; or [] discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner[.]" *Ex parte Cranman*,

792 So. 2d 392, 405 (Ala. 2000) (emphasis in original); *see also Ex parte Butts*, 775 So. 2d 173, 177 & 178 (Ala. 2000) (applying *Cranman* test).

State-agent immunity shields state officials from liability while they are discharging their duties in good faith. *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). "[A] State agent *shall not* be immune from civil liability in his [] personal capacity [] when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or [] when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his [] authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So.2d at 405. The Alabama Supreme Court has

> established a "burden-shifting" process when a party raises the defense of State-agent immunity. In order to claim State-agent immunity, the [defendants] bear the burden of demonstrating that [plaintiff]'s claims arise from a function that would entitle them to immunity. If the [defendants] make such a showing, the burden then shifts to [plaintiff], who, in order to deny the [defendants] immunity from suit, must establish that the [defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority. A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to

> detailed rules or regulations, such as those
> stated on a checklist."

*Giambrone v. Douglas*, 874 So.2d 1046, 1052 (Ala. 2003)

(internal citations omitted).

Alabama courts have held that "employees of the DOC [Alabama Department of Corrections] are entitled to State-agent immunity when in conducting the activities made the basis of the action they were exercising 'judgment in the administration' of the DOC." *Carpenter v. Tillman*, 948 So. 2d 536, 538 (Ala. 2006). Applying the test for State-agent immunity as set out in *Cranman*, there appears to be no dispute in this action that the defendants, employees of the Alabama Department of Corrections, are State agents who, at the time of the complained of incidents, were performing a function (managing the confinement of and/or guarding prisoners) – that entitles them to State-agent immunity. [18] *See Ex parte Ruffin*, 160 So. 3d 750 (Ala. 2014) (Concluding that the "confinement of prisoners" falls within the categories contemplated by *Ex parte Cranman*, 792

---

[18] In *Ex parte Ruffin*, the Plaintiff sued multiple officers after being stabbed by a mentally ill cellmate. The plaintiff alleged that the officers negligently, wantonly, and recklessly failed to protect him from an attack by another inmate . . . . that the petitioners knew . . . had a history of violence and that he had attacked other inmates and prison guards. [Plaintiff] also alleged that the petitioners knew that [the cellmate] did not like [Plaintiff] and that they should not have housed [the two] together.) 160 So. 3d 750, 754 (Ala. 2014).

So. 2d 392 (Ala 2000) in determining whether a State agent is entitled to immunity.) (citing *Howard v. City of Atmore*, 887 So. 2d 201, 206 (Ala. 2003). Accordingly, the burden shifts to Jones to establish that the defendants "acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority" or in violation of State laws, rules, or regulations and that the immunity is not applicable. *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

Jones fails to carry his burden of showing Defendants Myers, DeSpain, Everette, and Wiley (on Claim 1) are not entitled to state-agent immunity. Jones has filed no response in opposition to the defendants' claim of state-agent immunity and has offered no evidence that one of the exceptions in *Cranman* to state-agent immunity is applicable.[19] Furthermore, the record before the Court is void of facts that the defendants acted "willfully, maliciously, fraudulently, in bad faith, or beyond their authority", or against state laws or regulations. *Ex parte Randall,* 971 So. 2d 652, 662 (Ala. 2007) ("[P]oor judgment or wanton misconduct, an aggravated form of negligence,

---

[19] Notably, Jones argues against the defendants' assertion of qualified immunity regarding the constitutional claims brought in this action, but Jones fails to address the claim of state-agent immunity. (*See* Docs. 30, 31, 34).

does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in *Cranman*); *see also Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)(holding that State-agent immunity 'is not abrogated for negligent and wanton behavior; instead, immunity is withheld only upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority').

In his response, Jones argues that Defendants violated Alabama Department of Corrections Regulations by releasing inmate Gamble to general population, but he fails to show evidence of any such infraction. (Doc. 30 at 9). In support of his claim, Jones submits ADOC Administrative Regulation 433, but a reading of the requirements shows that Defendants complied with the regulations for "administrative segregation and housing for close or maximum custody. (Doc. 31-2 at 24-31). Specifically, the record shows an AR9 form was provided following the June assault; an investigation into the matter was conducted; Jones was visited by supervising officers and the members of the segregation board while in administrative segregation. Additionally, Jones presents no evidence that Defendant Wiley failed to follow specific state laws in

leaving his assigned guard post; Jones presents no evidence that he and inmate Gamble should have been classified as enemies after the June 29, 2014 incident, nor does Jones present evidence in the form of state laws or regulations that Defendants Myers and DeSpain should have required Jones and inmate Gamble to remain separated from each other after their respective releases from segregation. It appears, instead, from the record that the conduct alleged in this action was, at most, merely negligent and not willful, malicious, fraudulent, in bad faith, or beyond Defendants' authority. Thus, due to the lack of evidence supported by the record currently before the Court, state-agent immunity should be granted on the claims of negligence against Defendants Myers, DeSpain, and Everette, and to Defendant Wiley as to the claim that he negligently left his assigned post, Claim 1.

As to the negligence claims against Defendants Wiley and Scarbrough associated with Claims 2 and 3 asserted against them, the undersigned finds it is premature to analyze state law immunity from suit while the constitutional claims against them are pending. Thus, it is recommended that the state law negligence claim against Defendants Wiley and Scarbrough remain until the factual

issues related to the federal claims against them are determined.

**IV. Conclusion.**

Based on the foregoing analysis, the undersigned concludes that the motion for summary judgment should be **granted in part** and **denied in part.**

The undersigned finds that there are no genuine issues of material fact on the constitutional claims asserted against Defendants Walter Meyers, William DeSpain, and Michael Everette, and these defendants are entitled to judgment as a matter of law. It is further determined that Defendant John Wiley is entitled to summary judgment on Claim 1 asserted against him, leaving his assigned guard post on June 29, 2014. Therefore, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED** as to the claims against Defendants Myers, DeSpain, and Everette, as well as to Claim 1 asserted against Defendant Wiley, and that these claims be dismissed from the action.

It is further recommended that Summary Judgment be **GRANTED** in favor of Defendants Myers, DeSpain, Scarbrough, and Wiley (as to Claim 1 asserted against him) on Jones' negligent claims as they are entitled to state-agent immunity on those claims.

Additionally, the undersigned finds that there remains genuine issues of material fact on Claims 2 and 3 asserted against Defendants John Wiley and Gary Scarbrough, and that these defendants are not entitled to judgment as a matter of law on said claims. Therefore, it is recommended that Defendants' Motion for Summary Judgment be **DENIED** as to Defendants Wiley and Scarbrough on the claims that they failed to protect him or intervene in the June 29, 2014 assault and failed to provide him medical attention, and the factually related state law negligence claims shall also remain until the federal claims are adjudicated. It is further recommended that an **evidentiary hearing** be scheduled to address these claims.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1);

Fed.R.Civ.P. 72(b); S.D. Ala. L.R. 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **21st** day of **February, 2018.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**