## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| DE'ANGELO ARNEZ JONES, | * |
| | * |
| Plaintiff, | * |
| | * |
| vs. | * CIVIL ACTION NO. 15-00268-B |
| | * |
| JOHN WILEY, *et al.*, | * |
| | * |
| Defendants. | * |

### ORDER

On December 3-4, 2018, this matter came before the Court for a bench trial on Plaintiff De'Angelo Arnez Jones's claims against Defendants John Wiley and Gary Scarbrough. Jones asserts that Defendants Wiley and Scarbrough failed to intervene to protect him when he was attacked by a fellow inmate on June 29, 2014, and that they failed to take action to obtain medical care for him following the attack. (See Doc. 93 at 2). At trial, the Court heard testimony from Jones, Defendants Wiley and Scarbrough, Lieutenant Deveron Brown of ADOC, and ADOC inmates Bobby Shamburger, Jr. and Shakil Gamble.[1] After due consideration of the witnesses' testimony, other evidence presented, and the applicable law, the Court enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

---

[1] Inmates Shamburger and Gamble testified from Kilby Correctional Facility via video conferencing.

## I. FINDINGS OF FACT[2]

1. Defendants John Wiley ("Wiley") and Gary Scarbrough ("Scarbrough") were employed by ADOC and assigned to Holman Correctional Facility ("Holman") as correctional officers on June 29, 2014, the date of the subject attack.[3] At all pertinent times, Wiley and Scarbrough were acting under color of law and in the course and scope of their employment as correctional officers at Holman.

2. On June 29, 2014, Plaintiff De'Angelo Arnez Jones ("Jones") was an Alabama state prisoner incarcerated at Holman. He was assigned to and resided in housing unit C.

3. On June 29, 2014, Shakil Gamble ("Gamble") was an Alabama state prisoner incarcerated at Holman. He was assigned to and resided in housing unit C.

4. On June 29, 2014, Bobby Shamburger, Jr. ("Shamburger") was incarcerated at Holman. He was assigned to and resided in housing unit C.

---

[2] All findings of fact are by a preponderance of the evidence.

[3] Wiley worked as a correctional officer at Holman for approximately eight years before he resigned in October 2015. Scarbrough worked as a correctional officer for ADOC from July 2010 until October 2017.

5. On June 29, 2014, Wiley was assigned to work as the dormitory officer, or housing unit officer,[4] for Holman housing unit C for the shift beginning at 6:00 a.m. and ending at 6:00 p.m. He also worked a second shift from 6:00 p.m. to 10:00 p.m. and was assigned to work as the dormitory officer for Holman housing unit E.

6. In his position as a dormitory officer, Wiley's primary responsibility was the safety and protection of inmates. The post orders in effect on June 29, 2014 detailed the duties, responsibilities, and expectations for the position, including requiring a dormitory officer to constantly patrol the entire housing unit and make himself available to communicate with inmates inside the dormitory. A dormitory officer was also required to remain on post in the housing unit at all times, unless relieved by another officer or directed by a shift commander to leave the dormitory.[5]

---

[4] The terms "housing unit" and "dormitory" are used interchangeably to describe the communal living area that includes the inmates' beds, latrine, shower area, and TV room. The terms "dormitory officer" and "housing unit officer" are also used interchangeably to denote a correctional officer assigned to patrol a dormitory.

[5] The only situations in which a dormitory officer may leave the dormitory without first getting relief or permission from a shift commander are, first, if the officer is in pursuit of an inmate who is in possession of contraband or is a threat to institutional security and, second, if an officer working the dormitory hall or another housing unit needs assistance to control a situation
(Continued)

3

7. On June 29, 2014, Scarbrough was assigned to work as the population hall officer, or hall rover, for the main hall at Holman. Scarbrough's shift began at 6:00 a.m. and ended at 6:00 p.m. The evidence established that, based on its staffing levels at the time, Holman was short-staffed on June 29, 2014, and that Scarbrough was the only hall rover on the day shift.[6]

8. As the hall rover, Scarbrough's duties were, *inter alia*, to patrol the main hall of the facility and provide assistance in various other details or functions, such as population feeding, institutional counts, and pill call. A hall rover's duties also included providing break relief to dormitory officers and cubicle officers when instructed to do so by a supervisor.

9. On the day in question, housing unit C at Holman held 114 inmates, who slept on beds that were situated in four parallel rows inside the dormitory. There were approximately 28 or 29 beds in each row that went all the way back to the rear wall of the housing unit. The only entrance into and exit from the housing unit is through an orange barred gate. In addition to beds, the housing unit includes a TV room and a shower/restroom area, which

---

immediately, and no other help is available. There is no evidence that either situation occurred on June 29, 2014.

[6] The day shift at Holman begins at 6:00 a.m. and ends at 6:00 p.m., and the night shift runs from 6:00 p.m. to 6:00 a.m. the following morning.

4

are located near the front of the housing unit. There is also a correctional officer chair in the unit. It faces the rows of beds.

10. Outside of housing units B and C is a cubicle, Cubicle #1. It is manned by a correctional officer and is separated from the housing units by a narrow hallway. The officer inside of Cubicle #1 operates the gates that control entrance into and exit out of housing units B and C. Depending on the direction an officer inside of Cubicle #1 is facing, the officer can look down into housing units B and C and can see all the way to the rear wall of the housing units.

11. Cubicle #1 is required to be manned by a correctional officer at all times. Generally, only one officer is permitted inside Cubicle #1 at a time, unless the officer inside the cubicle is in the process of being relieved by another officer for a break or shift change.

12. The credible evidence establishes that at the time of the incident, Jones and Gamble were friends. Immediately before the June 29, 2014 assault, Jones and Gamble were observed having a discussion that turned heated. Gamble stabbed Jones with a homemade metal knife. The attack occurred without any warning, and was over almost as soon as it started.

13. The attack occurred not long after the end of the dinner meal, which began at approximately 3:10 p.m., and ended at approximately 4:25 p.m. The attack took place in the area of the

dormitory where the inmate beds were located. Jones sustained four stab wounds to his back and rear shoulder area, and one stab wound to his front chest or shoulder area. The diameter of the stab wounds was approximately the size of a pencil eraser.

14. After being stabbed, Jones fled to the front of housing Unit C. Gamble gave brief chase, and then voluntarily retreated to his bed area and smoked a cigarette. Another inmate, Bruce Peterson, helped to bandage Jones's wounds using tissue and office tape.

15. As noted *supra*, Defendant Wiley was assigned as the dormitory officer for housing unit C, on the 6:00 a.m. to 6:00 p.m. shift. Typically, dormitory officers are provided a break and a thirty-minute lunch outside of the housing unit. The Holman duty post log does not indicate the times at which Wiley took his breaks on June 29, 2014; however, it does reflect that Wiley was outside of housing unit C for some period of time *after* the dinner meal when he was sent to the central control area of the prison to retrieve a van key and gas card.[7]

16. There was a shift change at 6:00 p.m. At the 6:00 p.m. shift change, Wiley's assignment changed from dormitory officer of

---

[7] While it was not clear why Wiley was sent to retrieve the van key and gas card, the evidence was clear that Wiley would not have been allowed to go through the gate and leave the unit and retrieve the items without authorization from a supervisor.

6

housing unit C to dormitory officer for housing unit E. Scarbough's shift ended at 6:00 p.m.

17. Jones did not inform any correctional officers on the day shift, nor on the night shift, that he had been stabbed. Jones testified that Defendants Wiley and Scarbrough and an unnamed cadet were all in the cubicle observing the attack, which lasted ten to twenty minutes, and that they heard him banging on the front gate asking for help, yet refused to come to his aid. He also testified that shortly after the attack he took a shower in an effort to slow the flow of blood. The Court finds that Jones's testimony was not credible in a number of material aspects, and was not consistent with that of other witnesses, including the inmate witnesses. First of all, the inmate witnesses testified that Jones and inmate Gamble were friends, that the two had been smoking "spice" together immediately before the attack, that the attack was unexpected, that the attack was over almost as soon as it started, and that Jones did not take a shower after the incident. Additionally, Gamble testified that staff learned of the attack from an anonymous inmate tip, and that when questioned by authorities, both he and Jones denied that there had been an attack. Gamble's testimony in this regard was consistent with

Lieutenant Brown's[8] testimony that prison officials only learned of the attack through an anonymous tip, and that both Jones and Gamble denied any knowledge of an attack. It also adds further credence to Defendants Scarbough and Wiley's testimony that they did not observe the attack or Jones pleading for help. Moreover, the Holman duty log records contradict Jones's claim that a cadet was assigned to the cubicle area, and the records place Scarbough and Wiley handling duties outside of housing unit C around the time of the attack. Accordingly, the undersigned finds that neither Scarbough nor Wiley witnessed the attack or Jones's alleged pleas for help on June 29, 2014.

18. Following the evening shift change on June 29, 2014, Officer Lee notified the assistant shift commander, Sergeant Betts, that he had received an inmate tip that Jones had been stabbed by inmate Gamble. Sergeant Betts directed Officer Lee to bring Jones to the shift commander's officer. Shortly before 9:00 p.m., Officer Lee retrieved Jones from housing unit C, and escorted him to the shift commander's office for questioning by Sergeant Betts. Upon questioning by Sergeant Betts, Jones denied that he had been involved in an altercation with anyone and requested to

---

[8] At the time of the incident, Lieutenant Brown was actually Sergeant Betts. By the time of trial, she had been promoted to Lieutenant, and she testified that her last name had changed from "Betts" to "Brown."

return to his housing unit. Sergeant Betts directed Jones to lift his pant legs and shirt and discovered bandages on his upper body. As a result, she directed that he be taken to the healthcare unit for assessment.[9]

19. At the healthcare unit, Jones was examined by the nurse, and a body chart was performed. The records reflect that Jones advised the nurse that he had nothing to say about his wounds. The nurse checked Jones's wounds for infection, treated them with wound cleanser, re-bandaged the wounds, and gave Jones Motrin for pain. Jones was transferred to a segregation cell for investigation for fighting.

20. Later that same day, Gamble was summoned to the shift commander's office, where Sergeant Betts questioned him about an altercation with Jones. Like Jones, Gamble denied that there had been an altercation. After being questioned, Gamble was taken to the healthcare unit. Upon examination, no injuries were noted.

---

[9] Jones's testimony about the discussion in the shift commander's office differed greatly from that of Lieutenant Brown. The Court finds Lieutenant Brown's testimony concerning the discussion far more credible than Jones's, as Lieutenant Brown's testimony is consistent with contemporary medical documentation from the date of the incident and with inmate Gamble's testimony that both he and Jones refused to provide officers with any information about the stabbing.

Gamble was then transferred to a segregation cell for investigation for fighting.[10]

**II. CONCLUSIONS OF LAW**

1. The Court has jurisdiction over Jones's claims asserted under 42 U.S.C. § 1983 and state law pursuant to 28 U.S.C. §§ 1331 and 1367(a), and venue is proper in this district.

2. "Section 1983 creates a private cause of action for deprivations of federal rights by persons acting under color of state law." Johnson v. Boyd, 568 F. App'x 719, 721 (11th Cir. 2014) (per curiam) (citing 42 U.S.C. § 1983).

3. Jones's first constitutional claim is that Defendants Wiley and Scarbrough violated the Eighth Amendment by acting with deliberate indifference to a substantial risk of serious harm to Jones by failing to intervene while Gamble's attack on him was ongoing. The Eighth Amendment, which prohibits "cruel and unusual punishments," governs the conditions under which convicted prisoners are confined and the treatment they receive in prison.

---

[10] At trial, Lieutenant Brown was questioned extensively about why no incident report was prepared in accordance with ADOC procedures. While no incident report was prepared, Lieutenant Brown did document that both Jones and Gamble were placed in segregation because they were being investigated for fighting, and she testified that she left it to her supervisors to investigate further into the incident. Given that the staff only learned of the incident through an anonymous tip, and both Jones and Gamble denied that the incident ever occurred, it is plausible that no incident report was prepared because prison staff was trying to get to the bottom of everything.

See Farmer v. Brennan, 511 U.S. 825, 832 (1994). In DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189 (1989), the Supreme Court outlined a state's constitutional responsibilities with regard to inmates:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

489 U.S. at 199-200 (citations and parenthetical omitted).

4. It is well-established that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (citation and internal quotation marks omitted). A prison official, such as a correctional officer, can be liable under the Eighth Amendment for failing to take reasonable steps to intervene on behalf of a victim of an ongoing assault by another inmate. See Terry v. Bailey, 376 F. App'x 894, 895-96 (11th Cir. 2010) (per curiam); Murphy v. Turpin, 159 F. App'x 945, 948 (11th Cir. 2005) (per curiam). However, constitutional liability does not result from every injury suffered by a prisoner at the hands of another inmate.

11

Johnson v. Boyd, 701 F. App'x 841, 844 (11th Cir. 2017) (per curiam).

5. To establish an Eighth Amendment violation for failure to intervene in an ongoing assault, a prisoner must prove facts that "satisfy both an objective and subjective inquiry regarding a prison official's conduct." Id. at 844-45. For the objective component, a prisoner must prove the existence of a condition that is sufficiently serious to violate the Eighth Amendment, meaning that the condition must be extreme and pose an unreasonable risk of serious harm to the prisoner's future health or safety. Id. at 845. Under the subjective component, the prisoner must prove that the prison official, at minimum, acted with a state of mind that constituted deliberate indifference. Id. There are three components to deliberate indifference: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (quotation omitted). The Supreme Court has held that the "subjective recklessness" standard of criminal law is the appropriate test to determine deliberate indifference. See Farmer, 511 U.S. at 826. "The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir.

1990) (per curiam) (citations and internal quotation marks omitted).

    6.    To prevail on his Eighth Amendment claim against Wiley and Scarbrough for failure to intervene in the assault by Gamble, Jones was required to prove (1) a substantial risk of serious harm, (2) the Defendants' deliberate indifference to that risk, and (3) causation. See Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1582 (11th Cir. 1995).

    7.    Here, there is no question that the challenged condition, namely being stabbed with a knife by a fellow inmate, was objectively harmful enough to establish a constitutional violation. Accordingly, Jones met his burden of proving that there was a substantial risk of serious harm during Gamble's attack on him.

    8.    However, Jones failed to carry his burden to prove that Wiley and Scarbrough acted with deliberate indifference in failing to take reasonable steps to intervene on his behalf during the attack by Gamble. As to Scarbrough, who was assigned to the position of hall rover at the time the incident occurred, the Court found his testimony that he was unaware of the attack on June 29, 2014, to be credible. In addition, there was no evidence or even allegation that Scarbrough had knowledge prior to the commencement of the attack that Gamble posed a substantial threat to Jones. Accordingly, the Court cannot find deliberate indifference on the

part of Scarbrough to a substantial risk of serious harm to Jones posed by Gamble on the date in question.

9. With regard to Wiley, the Court has found that he did not witness the incident or become aware of the incident on June 29, 2014. As with Scarbrough, there was no evidence that Wiley could have known that Gamble posed a substantial risk of serious harm to Jones unless Wiley actually witnessed the incident or otherwise became aware of the occurrence of the incident. By all accounts, Jones and Gamble were on good terms until their verbal dispute just prior to the stabbing, and Jones himself was caught by surprise when Gamble stabbed him. Further, there was no evidence of prior incidents or disciplinary problems involving Gamble. Thus, from the evidence presented, Wiley could reasonably have only become aware that Gamble posed a substantial risk of serious harm to Jones by witnessing or otherwise becoming aware of the incident after it began. As the Court has found that Wiley did not witness or become aware of the attack while it was ongoing, the Court cannot find that Wiley was deliberately indifferent when he did not intervene during the assault.

10. Jones also failed to prove causation between the officers' allegedly deliberately indifferent failure to intervene during the attack and Jones' injuries. Causation requires a plaintiff to demonstrate a link between a defendant's act or omission and the excessive risk of harm, and a link between the

risk of harm and the plaintiff's injury. LaMarca v. Turner, 995 F.2d 1526, 1538-39 (11th Cir. 1993). The more believable testimony establishes that the incident began and ended too quickly for officers to effectively intervene to prevent any of the injuries suffered by Jones.

11. Because he did not meet his burden of demonstrating deliberate indifference or causation, Jones has failed to prove his Eighth Amendment claim for failure to intervene against Wiley and Scarbrough. Thus, Defendants have prevailed on that claim.

12. Jones's second constitutional claim is that Defendants Wiley and Scarbrough violated the Eighth Amendment by acting with deliberate indifference to his medical needs after the June 29, 2014 stabbing by failing to obtain medical treatment for him after the attack. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

13. To establish such a claim, Jones was required to prove "(1) a serious medical need; (2) [a] defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010) (per curiam) (citing Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir.

15

2009)). To satisfy the first objective element, a plaintiff must prove his condition was, in fact, a serious medical need. "A 'serious medical need' is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010) (internal quotations omitted).

14. There are three components to the element of deliberate indifference: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 811 U.S. at 837. A corrections officer "acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255 (citations and internal quotation marks omitted). Even where, as in the instant case, "medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need

is relevant in determining what type of delay is constitutionally intolerable." Id.

15. The presence of holes on Jones's body, which bled and required bandaging, undoubtedly constituted a serious medical need that was so obvious that even a layperson would recognize the need for treatment. Therefore, Jones established the first element of his claim.

16. However, Jones did not meet his burden to prove that Wiley and Scarbrough were deliberately indifferent to his serious medical need. As detailed above, the Court has found that Wiley and Scarbrough were not aware on June 29, 2014, that Jones had been stabbed. Authorities only learned of the stabbing through an anonymous inmate tip during the night shift. Without knowledge that Jones had been stabbed, Wiley and Scarbrough likewise had no knowledge that Jones needed medical attention. Thus, they did not act with deliberate indifference by failing to obtain medical treatment for him. Accordingly, Jones failed to prove all of the necessary elements of his Eighth Amendment claim against Wiley and Scarbrough for failure to obtain medical care after the attack, and Defendants have prevailed on that claim.

17. In addition to the § 1983 claims discussed above, Jones also arguably alleged state law negligence claims against Jones and Wiley. Defendants contend that they are entitled to sovereign immunity on Jones's state law tort claims because Ala. Code § 14-

17

6-1 insulates them from liability under state law. As amended by the Jailer Liability Protection Act, which came into effect in 2011, § 14-6-1 "provides correctional officers the 'same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law.'" Foster v. Maloney, 785 F. App'x 810, 818 (11th Cir. 2019) (per curiam) (quoting Ala. Code § 14-6-1);[11] see also Johnson v. Connor, 754 F.3d 918, 920 (11th Cir. 2014). "Among those 'protections' granted sheriffs under the Alabama Constitution is sovereign immunity from suit 'when they are executing their law enforcement duties.'" Maloney, 785 F. App'x at 818 (citing Connor, 754 F.3d at 919).

There is no dispute that Jones and Wiley were acting within the line and scope of their duties at all times relevant. Thus, whether the Defendants, as Alabama correctional officers, are entitled to immunity under state law depends on whether they were

---

[11] See also Ala. Code § 36-22-3(b) ("Any of the duties of the sheriff set out in subsection (a) or as otherwise provided by law may be carried out by deputies, reserve deputies, and persons employed as authorized in Section 14-6-1 as determined appropriate by the sheriff in accordance with state law. Persons undertaking such duties for and under the direction and supervision of the sheriff shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as he or she is acting within the line and scope of his or her duties and is acting in compliance with the law.").

"acting in compliance with the law" for purposes of § 14-6-1. See Young v. Myhrer, 243 F. Supp. 3d 1243, 1254 (N.D. Ala. 2017). "[O]nly when sufficient evidence exists that [an officer] has violated a criminal statute, a civil statute, or a constitutional principle does he lose the Jailer Act's sovereign immunity protection and become subject to Alabama tort laws." Id. at 1258; see also Dowdell v. Jones, 2019 U.S. Dist. LEXIS 41657, at *28-29, 2019 WL 1436385, at *8 (M.D. Ala. Mar. 13, 2019) ("Because Plaintiff's Third Amended Complaint does not present plausible allegations of fact showing that Welch was not in compliance with criminal statutes, civil statutes, or constitutional standards, Plaintiff's state law tort claim for false imprisonment is subject to the immunity afforded by [§ 14-6-1]."), report and recommendation adopted as modified, 2019 U.S. Dist. LEXIS 54149, 2019 WL 1440286 (M.D. Ala. Mar. 29, 2019). In this case, Jones has failed to show that Defendants Wiley and Scarbrough acted in violation of criminal statutes, civil statutes, or constitutional standards; thus, Wiley and Scarbrough are entitled to sovereign immunity pursuant to § 14-6-1 with respect to Jones's state law tort claims.

### III. **CONCLUSION**

Based on the foregoing findings of fact and conclusions of law, Plaintiff's claims against Defendants Wiley and Scarbrough under 42 U.S.C. § 1983 must be dismissed with prejudice. Further,

19

Defendants Wiley and Scarbrough are protected by sovereign immunity with respect to Jones's state law tort claims. To whatever extent, if any, any of the foregoing findings of fact constitute conclusions of law and vice versa, they are adopted as such. Judgment will be entered accordingly.

**DONE** this **23rd** day of **March, 2020.**

                                      **_/s/ SONJA F. BIVINS_**
                                **UNITED STATES MAGISTRATE JUDGE**